FILED

2025 Sep-10  AM 09:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **LATRICIA JONES,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **Case No.: 2:23-cv-513-ACA** |
| | ] | |
| **CITY OF BIRMINGHAM,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## MEMORANDUM OPINION

Plaintiff Latricia Jones sued Defendant City of Birmingham for disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a) ("Count One"); retaliation in violation of the ADA, *id.* § 12203(a) ("Count Two"); and race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a) ("Count Three"). (Doc. 1).

The City moves for summary judgment on all but Ms. Jones's retaliatory hostile work environment claim in Count Two. (Doc. 36; *see generally* doc. 37). For the reasons set out below, the court **WILL GRANT** the City's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor on Count One, the part of Count Two that asserts retaliation by failure to reasonably accommodate, and Count Three. Ms. Jones's retaliatory hostile work environment claim in Count Two shall proceed to trial.

# I.    BACKGROUND

In deciding a motion for summary judgment, the court is "required to view the evidence and all factual inferences therefrom in the light most favorable to [Ms. Jones], and to resolve all reasonable doubts about the facts in her favor." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1341 (11th Cir. 2022) (quotation marks omitted; alterations accepted). Where the parties have presented evidence creating a dispute of fact, the court's description of the facts adopts the version most favorable to the non-movant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

Ms. Jones, a black woman, was employed by the City of Birmingham as a public safety dispatch supervisor when the events giving rise to this litigation occurred. (*Cf.* doc. 34-1 at 75; *id.* at 27–28). As dispatch supervisor, Ms. Jones supervised three fire dispatchers, who each answered 911 calls related to fire and/or medical emergencies. (*Id.* at 29–31; doc. 34-3 at 100–01, 112). All dispatchers and dispatch supervisors, including Ms. Jones, worked twelve-hour shifts, and there was only one dispatch supervisor on duty per shift. (Doc. 34-3 at 100, 102). When emergency calls came in, the dispatch supervisor would have to dispatch the necessary unit, communicate with the officers on scene, call utilities to shut off

services at the location of the emergency, and document those interactions. (*Id.* at 100–01). If the emergency was long lasting, such as a large fire, the supervisor would have to attend to their radio and computer until the emergency died down, which could be hours later. (*Id.* at 101, 111). For this reason, the minimum qualifications for the dispatch supervisor position included that an applicant be "[w]illing to work any shift (e.g., . . . [twelve]-hour) on any . . . day (e.g., nights, weekends, holidays) and overtime as needed." (Doc. 34-4 at 19).

In December 2020, Antoinette King, also a black woman, became Ms. Jones's supervisor. (Doc. 34-1 at 31, 37, 71).[1] Only one week after Ms. King became Ms. Jones's supervisor, Ms. Jones "knew she needed to stay away from Ms. King" because Ms. King did not like Ms. Jones "as a whole," and Ms. Jones felt that Ms. King created a hostile work environment for Ms. Jones. (Doc. 34-1 at 76–77, 82). For example, Ms. King did not try to interact with Ms. Jones as she did with other dispatch supervisors. (*Id.* at 81).

In June 2021, Ms. Jones suffered a "[c]avernous . . . intercranial aneurysm," which impacted her vision and caused headaches, vertigo, and "dizzy spells." (Doc. 34-1 at 39–40). She returned to work several weeks later and requested multiple

---

[1] Ms. Jones testified at one point during her deposition that Ms. King became her supervisor in December 2021 (doc. 34-1 at 76), and she testified at other points that Ms. King started in December 2020 (*id.* at 37, 82). Because the record indicates that Ms. King was Ms. Jones's supervisor during mid-2021 (*see id.* at 42–43, 50), the court reasonably infers that Ms. King became Ms. Jones's supervisor in December 2020.

accommodations at the suggestion of her treating physician, including working only five consecutive days instead of seven or eight; working only eight-hour shifts instead of twelve-hour shifts; taking three-to-four thirty-minute breaks each shift so she spent no more than four hours on the computer without breaks; and decreasing stress. (*Id.* at 46–49; doc. 34-2 at 20–21). Ms. Jones hoped to retain her job as dispatch supervisor (doc. 34-1 at 84), and prior to 2021, a white employee named Alan Joiner, who was a police dispatch supervisor, suffered from a heart condition but was allowed to remain a dispatch supervisor. (Doc. 34-1 at 67–68).

The City agreed to temporarily accommodate Ms. Jones for thirty days while her accommodation requests were pending by assigning her to switchboard operator instead of dispatch supervisor. (Doc. 34-1 at 34–35, 50–51; doc. 34-2 at 24). Although switchboard operator was at a lower pay grade than dispatch supervisor, the City paid Ms. Jones the same wages she earned as dispatch supervisor for the duration of this temporary assignment. (Doc. 34-1 at 35; doc. 34-3 at 36). Ms. Jones received all the accommodations she requested as a switchboard operator, but she could only take the thirty-minute breaks if she found coverage. (Doc. 34-1 at 52–53).

During the temporary accommodation, the City's chief officer of human resources met with Ms. Jones to discuss Ms. Jones's options. (*Id.* at 50; doc. 34-2 at 25). The chief officer told Ms. Jones that she had talked to Ms. King, and they

determined that Ms. Jones was unfit to serve as a dispatch supervisor. (Doc. 34-1 at 50). This left Ms. Jones with the options of getting on a list to apply for other available positions, accepting the switchboard operator position for permanent placement, or applying for disability. (*Id.* at 58–59, 64–65, 84–85). Ms. Jones also talked to Ms. King and asked to be considered for a position as supervisor over 311, but the position was already filled (*id.* at 59–60, 84), so Ms. Jones told the chief officer of human resources and Ms. King that she was only interested in her job, the dispatch supervisor position (*id.* at 84). The City then extended Ms. Jones's temporary accommodation until October 2021 but notified her that it would fill her previous position, and the City told her that it was her responsibility to find other employment opportunities with the City. (Doc. 34-2 at 25).

Ms. Jones was not selected for other employment opportunities with the City (doc. 34-1 at 51–52), so she applied for disability at the end of the temporary accommodation (*id.* at 65). She then filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that the City had discriminated and retaliated against her because of her disability and race. (*Id.* at 19).

Ms. Jones testified that "[Ms.] King [wa]s the only person" who discriminated against her, retaliated against her, or created a hostile work environment while Ms. Jones was employed by the City. (Doc. 34-1 at 75, 79, 82). Ms. Jones did not recall any race-based statements or racial slurs used by Ms. King or other City

employees during her tenure. (*Id.* at 72–75). And the only retaliatory statement Ms. Jones could recall was Ms. King's statement that "[w]ord on the street" was that Ms. Jones did not like Ms. King. (*Id.* at 80).

## II.    DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

### 1.    Disability Discrimination

In Count One, Ms. Jones asserts claims of disability discrimination against the City for failing to reasonably accommodate her and creating a hostile work environment. (Doc. 1 ¶¶ 34–36). The court will first consider Ms. Jones's allegation that the City failed to reasonably accommodated her, followed by her allegation that the City created a hostile work environment.

#### a.    *Failure to Reasonably Accommodate*

"The ADA bars employers from discriminating against a qualified individual on the basis of disability." *Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1191 (11th Cir. 2024) (quotation marks omitted; alteration accepted). "In the absence of direct

evidence, . . . [a]n ADA plaintiff establishes a *prima facie* case by showing (1) she has a disability; (2) she is a qualified individual under the ADA; and (3) the employer discriminated against her on the basis of disability." *Id.* at 1191–92 (quotation marks omitted). The ADA defines a "qualified individual" as an employee "who, with or without reasonable accommodation, can perform the essential functions" of her job. 42 U.S.C. § 12111(8). The employer's judgment and any written description of the job used for advertising or interviewing applicants may be considered evidence of the job's essential functions. *Id.* The ADA defines a "direct threat" as "a significant risk to the health or safety of others than cannot be eliminated by reasonable accommodation," *id.* § 12111(3), and it explains that an employer may use the creation of a direct threat as a defense to any discrimination charge, *id.* § 12113(a)–(b).

The City concedes that Ms. Jones suffers from a disability (doc. 37 at 16), but it argues that she is not a qualified individual because the evidence does not demonstrate that she could perform the essential functions of dispatch supervisor, even with reasonable accommodation (*id.* at 17–21). Put another way, the City argues that Ms. Jones was a "direct threat," and she fails to prove that reasonable accommodation was available. (*Id.* at 20). The court agrees.

The City has produced evidence that Ms. Jones could not perform the essential functions of dispatch supervisor with reasonable accommodation and without

creating a direct threat. Ms. Jones's requested accommodations included working only eight-hour shifts instead of twelve-hour shifts, taking three-to-four thirty-minute breaks each shift so she spent no more than four hours on the computer without breaks, and decreasing stress. (Doc. 34-2 at 20–21). But the minimum qualifications of dispatch supervisor as listed in the job description included one's "[w]illing[ness] to work any shift (e.g., . . . [twelve]-hour) on any . . . day (e.g., nights, weekends, holidays) and overtime as needed." (Doc. 34-4 at 19). And Ms. Jones does not dispute that emergencies sometimes lasted hours, during which the dispatch supervisor could not take breaks. (*Compare* doc. 37 at 4 ¶ 10, *with* doc. 42 at 1–2 (not disputing ¶ 10)). If the supervisor could not stay on the radio during an emergency and lost connection with the officers on the scene, the consequences could be injury or death (doc. 34-3 at 112–13), which constitutes "a significant risk to the health or safety of others," 42 U.S.C. § 12111(3).

Finally, given that dispatch supervisors must "[d]ispatch[] public safety personnel . . . and inform[] responding units of pertinent information regarding emergency situations" (doc. 34-4 at 18), a reasonable factfinder could not conclude that the City could have accommodated Ms. Jones's request to decrease stress without creating a direct threat. The very nature of Ms. Jones's job position required that she attend to stressful emergency situations for extended periods of time, sometimes multiple emergencies at a time. (Doc. 34-3 at 109–10, 112). In response,

Ms. Jones offers no facts or arguments that rebut the City's direct threat defense. (*See* doc. 42 at 1–2, 4–7); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("The issue is whether [the plaintiff, in response to the defendant's direct threat argument,] produced evidence from which a reasonable jury could conclude [s]he was not a direct threat.").

And even though "a plaintiff will always survive summary judgment if she presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination," Ms. Jones fails to present such evidence. *Akridge*, 93 F.4th at 1197 (quotation marks omitted; alterations accepted); (*see* doc. 42 at 1–2, 7). Ms. Jones's only attempt to present a convincing mosaic is the conclusory assertion that the City compelled her to take a demotion or file for disability, "despite positions that were available that would allow her to retain her employment." (Doc. 42 at 7) (not citing to any evidence). The only evidence in Ms. Jones's statement of facts related to other available positions is her testimony that she asked Ms. King about the 311 dispatch supervisor position, but Ms. King refused "because the position was already given to" another employee. (*See* doc. 42 at 2 ¶ 37 (citing to doc. 34-1 at 59); *see also* doc. 34-1 at 60). Moreover, Ms. Jones does not dispute that she was unqualified for that position. (*Compare* doc. 37 at 8 ¶ 32, *with* doc. 42 at 1–2 (not disputing ¶ 32)).

Because Ms. Jones fails to make out a *prima facie* case for—or a convincing mosaic of—disability discrimination, her claim that the City violated the ADA by failing to accommodate her disability fails as a matter of law.

### b.    Hostile Work Environment

The Eleventh Circuit has previously assumed, albeit in an unpublished opinion, that harassment is a viable claim under the ADA because it is viable under Title VII and the statutes use identical language. *Stewart v. Jones Util. & Contracting Co. Inc.*, 806 F. App'x 738, 740–41 (11th Cir. 2020). Finding its logic persuasive, this court will assume the same, *see McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1060 (11th Cir. 2022), and will apply the Title VII standard for hostile work environment claims to Ms. Jones's ADA claim, *see Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 n.7 (11th Cir. 2021) ("[B]ecause [the court] analyze[s] ADA-discrimination claims under the same framework as Title VII . . . discrimination claims, [the court] often cite[s] case law under [the] statutes interchangeably."). Thus, "hostile work environment claims require proof that the hostile work environment was based on the employee's protected characteristic." *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 836 (11th Cir. 2021) (quotation marks omitted).

The City argues that Ms. Jones fails to prove the existence of a hostile work environment because, among other reasons, she does not show that she experienced

any harassment because of a protected characteristic. (Doc. 37 at 22). The court agrees. Ms. Jones testified that Ms. King was the only person who created a hostile work environment for her while employed by the City, and that the hostile work environment began as soon as Ms. King became Ms. Jones's supervisor in December 2020. (Doc. 34-1 at 82). But Ms. Jones did not suffer from her disability, the cavernous intercranial aneurysm, until June 2021, which was several months after the hostile work environment began. (*See* doc. 34-1 at 35, 39, 76–77); *see supra* note 1.

Moreover, Ms. Jones testified that Ms. King did not like Ms. Jones "as a whole," and when asked if Ms. King's treatment of Ms. Jones was related to Ms. Jones's disability, Ms. Jones stated that she did not know. (*Id.* at 77, 81–82). In response, Ms. Jones neither responds to the City's arguments about this claim nor introduces evidence to rebut the evidence presented by the City. (*See* doc. 42 at 1– 2, 7). Because a reasonable juror could not find that Ms. Jones was subjected to a hostile work environment based on her disability, her claim that the City discriminated against her by creating a hostile work environment, in violation of the ADA, fails as a matter of law.

Accordingly, Ms. Jones has failed to provide sufficient evidence that the City intentionally discriminated against her on the basis of her disability, so the court

**WILL GRANT** the City's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in its favor on Count One.

<u>2.</u>    <u>Retaliation in Violation of the ADA</u>

In Count Two, Ms. Jones alleges that the City retaliated against her in violation of the ADA by failing to reasonably accommodate her and creating a hostile work environment after she engaged in protected activity by requesting accommodations. (Doc. 1 ¶ 40). "Three things are required at the outset to support a retaliation claim: (1) a protected activity, (2) an adverse employment action, and (3) a causal connection between them." *McCreight v. AuburnBank*, 117 F.4th 1322, 1339 (11th Cir. 2024). The court will first consider Ms. Jones's retaliatory failure-to-accommodate claim, followed by her retaliatory hostile work environment claim.

<u>a.</u>    *Failure to Reasonably Accommodate*

Ms. Jones alleges that "[a]fter . . . requesting a reasonable accommodation, the [City] . . . failed to accommodate [Ms. Jones], giving her the only options of resignation or significant demotion." (Doc. 1 ¶ 40). "A request for a reasonable accommodation is a protected activity[,] . . . [b]ut a plaintiff may not point to the denial of that reasonable accommodation as an adverse action." *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 999 (11th Cir. 2025). The City argues, among other things, that "the reassignment [of Ms. Jones] to the switchboard operator position was not an

adverse action." (Doc. 37 at 29). Given the unequivocal holding of *Jimenez*, the court agrees.

Because a plaintiff cannot "re-clothe a failure-to-accommodate claim as a retaliation claim," the court **WILL GRANT** the City's motion and **WILL ENTER SUMMARY JUDGMENT** as to Ms. Jones's retaliatory failure-to-accommodate claim in Count Two. *Jimenez*, 146 F.4th at 999 (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001)).

### b.    Hostile Work Environment

After reviewing the parties' briefs, the court determines that the City moves for summary judgment only against the first adverse action that Ms. Jones alleges, failure to accommodate. (*See* doc. 37 at 28–31). The only arguments in the City's brief about hostile work environment address Ms. Jones's discrimination claim, not her retaliation claim. (*Compare id.* at 22, 39–41; *with id*. at 26–31). And the Eleventh Circuit has recognized that retaliatory hostile work environment is a separate cause of action under Title VII with a more lenient standard than a hostile work environment discrimination claim.[2] *See Monaghan v. Worldpay US, Inc.*, 955 F.3d

---

[2] To survive summary judgment on a retaliatory hostile work environment claims, the plaintiff must demonstrate that (1) she engaged in protected activity, *Adams v. Austal*, U.S.A., L.L.C., 754 F.3d 1240, 1248 (11th Cir. 2014); (2) was subjected to harassment that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Monaghan*, 955 F.3d at 861; and (3) a causal connection exists between the protected conduct and the harassment, *Adams*, 754 F.3d at 1248. This harassment standard is specific to "retaliation based on protected conduct" and "is more easily satisfied[] than the standard applicable to claims of discrimination," which is the severity and pervasiveness test. *Monaghan*, 955 F.3d at 861.

855, 861 (11th Cir. 2020); *see also Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) ("[The Eleventh Circuit] assesses ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII.")

Because the City fails to move for summary judgment against Ms. Jones's retaliatory hostile work environment claim under the ADA, that claim shall proceed to trial.

### 3.    Race Discrimination

Finally, in Count Three, Ms. Jones alleges that the City discriminated against her because of her race by failing to reasonably accommodate her. (Doc. 1 ¶¶ 43–45). To survive summary judgment, Ms. Jones must demonstrate that the City intentionally discriminated against her on the basis of a protected characteristic." *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1024 (11th Cir. 2016). Ms. Jones attempts to satisfy this burden using circumstantial evidence, arguing that she establishes a *prima facie* case of race discrimination under the *McDonnell Douglas* framework because the City treated Mr. Joiner, a white dispatch supervisor for the police pod, more favorably by granting his request for accommodations. (Doc. 42 at 9–10).

Among other requirements, Ms. Jones can make out a *prima facie* case of race discrimination if she "present[s] evidence of a comparator," or "someone who is

14

similarly situated in all material respects." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (quotation marks omitted). "Although what constitutes a material similarity or difference will differ from case to case, ordinarily a similarly situated comparator and the plaintiff will: have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history." *Id.* (quotation marks omitted). Among other things, the City argues that Ms. Jones fails to provide sufficient evidence that Mr. Joiner was similarly situated. (Doc. 37 at 34–36). The court agrees.

Ms. Jones does not present sufficient evidence to support that she and Mr. Joiner were similarly situated. (*See* doc. 42 at 1–2, 10). The only potentially relevant evidence that Ms. Jones cites is her testimony that in 2021, the fire and police pods had separate dispatchers but the City was "trying to train or cross train for other individuals to come over. So they did have individuals sitting with [fire] from [the] police . . . side." (doc. 34-1 at 29; *see* doc. 42 at 1 ¶ 8). But this evidence does not establish that she and Mr. Joiner were subject to the same employment policies or shared an employment history. Additionally, in Ms. Jones's deposition, she testified that she never saw Mr. Joiner's accommodation paperwork and "[could]n't say for certain" what accommodations he requested. (Doc. 34-1 at 67). And Ms. King—who, according to Ms. Jones, was the only person who

discriminated against Ms. Jones on the basis of race (doc. 34-1 at 75)—never supervised Mr. Joiner (doc. 34-3 at 32). Accordingly, Ms. Jones fails to meet her burden under *McDonnell Douglas*.

Notwithstanding the above analysis, Ms. Jones may also survive summary judgment by presenting enough evidence to raise a "reasonable inference of intentional discrimination." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 947 (11th Cir. 2023) (citation omitted) (quotation marks omitted), *cert. denied*, 145 S. Ct. 154 (2024). A plaintiff satisfies this burden by pointing to evidence that demonstrates, among other things, "(1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins*, 26 F.4th at 1250 (quotation marks omitted); *see also McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024) ("The convincing mosaic approach is—in its entirety— the summary judgment standard.").

As explained above, Ms. Jones has not established that she and Mr. Joiner were similarly situated, so that evidence is irrelevant to her mosaic. The only other evidence Ms. Jones presents is that she could attend doctor's appointments only when she got coverage and that Ms. King refused to place Ms. Jones in the 311 dispatch supervisor position. (*See* doc. 42 at 1–2) (citing doc. 34-1 at 57, 59). But Ms. Jones testified that Ms. King did not like her "as a whole," and when asked if

Ms. King did not like Ms. Jones because of her race, Ms. Jones replied that "to classify it as just under race . . . would not be fair to say." (Doc. 34-1 at 77). This evidence is insufficient to create a reasonable inference that the City intentionally discriminated against Ms. Jones on the basis of race.

Accordingly, the court **WILL GRANT** the City's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor on Count Three.

### III.    CONCLUSION

The court **WILL GRANT** the City's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor on Count One, the part of Count Two that asserts retaliation by failure to reasonably accommodate, and Count Three. Ms. Jones's retaliatory hostile work environment claim in Count Two shall proceed to trial.

The court will enter a separate final judgment consistent with this opinion.

**DONE** and **ORDERED** this September 10, 2025.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE